# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

FRANK LEONE and
CLARENCE GRUBBS,

      Plaintiffs/Counter-Defendant,

        v.

H&B LAND, INC., ELITE TOW-
ING, INC., BENJAMIN McGuire
and CHARLES HILKERT,

      Defendants/Counter-Plaintiffs.

Case No. 16-10557
Hon. Terrence G. Berg

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 21)

## I.    Introduction

Two tow truck drivers are suing their employers under the Fair Labor Standards Act for allegedly failing to pay overtime wages. In response, the Defendant employers filed an extortion counterclaim against one of the Plaintiff truck drivers, Grubbs. Defendants moved for summary judgment on Plaintiffs' overtime pay claim, and on their counterclaim against Plaintiff Grubbs. Although a hearing was initially scheduled for June 30, 2017, the Court has concluded that oral argument would not be beneficial to the resolution of the pending motions. Accordingly, Defendants' motion for summary judgment will be decided solely on the basis of the parties' written

submissions. *See* E.D. Mich. LR 7.1(f). For the reasons outlined below, Defendants' motion is **DENIED**.

## II.   Background

Plaintiffs Frank Leone ("Leone") and Clarence Grubbs ("Grubbs," collectively "Plaintiffs") were employed by Defendant towing companies H&B Land, Inc. ("H&B") and Elite Towing, Inc. ("Elite") as tow truck drivers. Dkt. 21, Pg. ID 85. Defendant Benjamin McGuire ("McGuire") is the president of H&B and is a shareholder of Elite. *Id.* Defendant Charles Hilkert ("Hilkert") is a director and shareholder of both H&B and Elite. *Id.* The corporate and individual defendants shall be referred to collectively as "Defendants." Plaintiffs filed this case on February 16, 2016, alleging that Defendants violated the Fair Labor Standards Act by failing to pay Plaintiffs overtime wages for hours worked in excess of forty per week. Dkt. 1, Pg. ID 1, 6. On March 31, 2016, Defendants filed a counterclaim against Plaintiff Grubbs, alleging extortion. Dkt. 5. The Court views the facts in a light most favorable to Plaintiffs, as the non-moving parties.

As tow truck drivers, Plaintiffs provided roadside automotive repair services and towed disabled or abandoned vehicles. Dkt.1, Pg. ID 4. Plaintiff Leone was employed by Defendants from 2010 until December 2014. Dkt. 1, Pg. ID 4. He voluntarily left H&B because he bought his own tow truck. Dkt. 21-5, Pg. ID 167. Leone claims

that he is entitled to overtime for the period from February 2013 to December 2014. *Id.* at 168, 171. Plaintiff Grubbs was employed with Defendants or their predecessors from 2006 until January 2016. Dkt. 1, Pg. ID 4.

Plaintiffs do not know the precise number of hours they worked; they rely on estimates based on their regular work schedules. Dkt. 25, Pg. ID 252. Leone's regular shift from February 2013 to December 2014 was from 7:00 a.m. to 7:00 p.m., seven days per week, totaling eighty-four weekly hours. Dkt. 21-5, Pg. ID 168. Leone testified he does not believe he took any time off from work during this period except one day, to attend a single court appearance. Dkt. 21-5, Pg. ID 173. From June 2013 to January 2016, Grubbs's regular shift was from 7:00 p.m. to 7:00 a.m., seven days per week, also totaling eighty-four weekly hours. Dkt. 21-4, Pg. ID 146–47. Grubbs testified he only took three days off during this time period. Dkt. 21-4, Pg. ID 147. Defendants' practice was to give Plaintiffs paychecks for forty hours at $10.00 per hour and cash for remaining forty-four hours at $10.00 per hour. Dkt. 21-4, Pg. ID 150; Dkt. 21-5, Pg. ID 168. In other words, each week Defendants would provide Plaintiffs a paycheck for $400 less payroll tax deductions and an envelope containing $440 of cash. Dkt. 21-4, Pg. ID 147.

Plaintiffs testified that during their shifts, they were required to remain at Defendants' facility between towing calls. Dkt. 21-4, Pg.

ID 156; Dkt. 21-5, Pg. ID 170. In a typical day, Leone would take at least four towing calls, each lasting about forty minutes. Dkt. 21-5, Pg. ID 171. Grubbs would take two or three forty-minute towing calls, some days more, some fewer. Dkt. 21-4, Pg. ID 147, 154. Plaintiffs also testified to performing other duties, such as moving vehicles around Defendants' lot, sweeping, changing oil or tires, and removing snow. Dkt. 21-4, Pg. ID 148–49; Dkt. 21-5, Pg. ID 171–72.

When not taking towing calls or performing other miscellaneous duties, the Plaintiffs engaged in personal activities both on and off Defendants' premises. Leone stated that he occasionally left the premises to visit his bank, home, or mother's home and run errands. Dkt. 21-5, Pg. ID 174–75. He further stated that he was required to inform Defendants of such trips and remain available for towing calls during his scheduled shift. Dkt. 21-5, Pg. ID 174. Grubbs testified he only left Defendants' premises for towing calls or lunch. Dkt. 21-4, Pg. Id 147. Plaintiffs were free to engage in other activities such as watching television, playing computer games, surfing the Internet, and sleeping on a company-provided mattress during the hours of their shifts when they were not otherwise engaged. Dkt. 21-4, Pg. ID 152–53; Dkt. 21-5, Pg. ID 173–74. However, Plaintiffs were required to stand ready during their entire shifts to respond to towing calls within twenty minutes from the time of the call. Dkt. 21-4, Pg. ID 161.

Other former and current employees of Defendants offer declarations that contradict Plaintiffs' testimony in part. H&B and Elite dispatchers John Gusumano and Curt Eddins knew Plaintiffs when they all worked for Defendants. Dkt. 21-8, Pg. ID 197; Dkt 21-9, Pg. ID 202. Former and current H&B and Elite drivers Riad Azzo, Shendrew Leonard, and Mark Maag also knew Plaintiffs during Plaintiffs' employments. Dkt. 21-10, Pg. ID 207; Dkt. 21-11, Pg. ID 212; Dkt. 21-12, Pg. ID 217.

These employees stated that drivers, including Plaintiffs, were not required to and did not spend all of their shifts on Defendants' premises or at a location controlled by Defendants. Dkt. 21-8, Pg. ID 197; Dkt. 21-9, Pg. ID 202; Dkt. 21-10, Pg. ID 207; Dkt. 21-11, Pg. ID 212; Dkt. 21-12, Pg. ID 217. They further stated that Defendants' drivers, including Plaintiffs, left Defendants' premises to go home or use time for personal purposes; that Plaintiffs routinely left the premises before their replacements arrived; and that it was Defendants' practice and verbal policy to permit drivers, like Plaintiffs, to spend time at home and conduct personal activities during their shifts. Dkt. 21-10, Pg. ID 207; Dkt. 21-11, Pg. ID 212; Dkt. 21-12, Pg. ID 217.

Drivers Riad Azzo, Shendrew Leonard, and Mark Maag stated they could leave Defendants' premises as they pleased. *Id*. Drivers, including Plaintiffs, did not check in at the start of their shift, check

5

out at the end of their shift, or wait until replacements arrived to leave. *Id.* The Plaintiffs were not required to inform dispatchers of their whereabouts. Dkt. 21-8, Pg. ID 198; Dkt. 21-9, Pg. ID 203. The Plaintiffs rendered automotive repair services on an "as needed basis." *Id.* Dispatchers would contact Plaintiffs daily at their homes to dispatch them to repair sites. *Id.* When Plaintiffs could not be reached, the dispatchers called other drivers to perform the work. *Id.* Defendants' principle source of business was the Detroit Police Department. Dkt. 21-4, Pg. ID 148. Defendants were required to have a tow truck respond within twenty minutes after a call was made to dispatch. Dkt. 21-4, Pg. ID 161.

The factual allegations that led to Defendants' counterclaim against Grubbs are as follows. On February 17 and March 2, 2016, after Plaintiffs filed this lawsuit, Plaintiff Grubbs sent text messages to Defendant Hilkert. Dkt. 21-7, Pg. ID 188–94. On February 17, 2016, Grubbs sent Hilkert a text message stating: "This is Clarence if you want to settle out of court call me." Dkt. 21-7, Pg. ID 188. On March 2, 2016, Grubbs sent Hilkert a second text message stating:

> Chuck I have depositions from 7 police officers one sargent [sic] one lieutenant. I've been recording opening my check for over a year so you guys want to play games go

6

ahead you're the one going to jail for tax evasion.[1] I will call the IRS the insurance investigator and the arson investigator.[2] All I want is the $ you assholes owe me not a penny more. Call my bluff. You want the insurance investigator name and number refresh your memory. Saved it just for this occasion.

Dkt. 21-7, Pg. ID 188–94. Grubbs admitted he sent the text messages to coerce Defendants to pay him what he felt he was owed. Dkt. 21-4, Pg. ID 160. The counterclaim consists of one count, "COUNT I – EXTORTION," and asserts a cause of action for extortion pursuant to Mich. Comp. Laws §750.213. Dkt. 5, Pg. ID 32. Defendants seek summary judgment in their favor on this counterclaim, contending that there is no genuine issue of material fact that Plaintiff Grubbs's text messages constitute extortion.

---

[1] Grubbs admitted during his deposition in this case that he did not have depositions from seven police officers and did not have recordings of opening checks. Dkt. 21-4, Pg. ID 157–58.

[2] Grubbs testified: "I was going to tell [the police] about the timeline when [Defendants] bought the business and how all of the houses right around the immediate business started burning down." Dkt. 21-4, Pg. ID 159. Grubbs further testified that a damaged truck owned by Defendants caught fire, and Grubbs suspected the repairs to this damaged truck would have been costly had it not ultimately caught fire. Dkt. 21-4, Pg. ID 158–59. Defendants made an insurance claim on this truck, and McGuire asked Grubbs to speak with the insurance adjuster, whom Grubbs believed to be suspicious of the insurance claim. *Id.* Grubbs had not seen anything, which he told the adjuster. *Id.* Grubbs believes, however, that Defendants were responsible for setting the truck on fire. Dkt. 21-4, Pg. ID 159. He intended to tell the insurance adjuster or an arson investigator about his suspicion, based in part on the fact that a number of properties around H&B's premises "started burning down" after McGuire and Hilkert bought the business. *Id.*

7

### III.   Standard of Review

Summary judgment is proper when "the pleadings, deposits, answers to interrogatories, and admissions on file, together with exhibits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A fact is material only if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's

8

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

## IV.  Analysis

### a.  Fair Labor Standards Act Claim

Section 7 of the Fair Labor Standards Act of 1938 (29 U.S.C. § 207) provides that "persons may not be employed for more than a stated number of hours a week without receiving at least one and one-half times their regular rate of pay for the overtime hours. The amount of money an employee should receive cannot be determined without knowing the number of hours worked." 29 C.F.R. § 785.1. It is well established that "an FLSA plaintiff must prove by a preponderance of the evidence that he or she performed work for which he or she was not properly compensated." *White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012) (quoting *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999)).

9

Defendants contend that they do not owe Plaintiffs compensation for time spent waiting for towing calls. Plaintiffs claim that genuine issues of material fact remain regarding whether their waiting time was compensable. Waiting time is not compensable if employees are "waiting to be engaged" rather than "engaged to wait." 29 C.F.R. § 785.14. "In determining whether an employee is engaged to wait or waiting to be engaged, the critical inquiry is whether the time spent waiting is primarily for the benefit of the employer or employee." *Bernal v. Trueblue, Inc.*, 730 F. Supp. 2d 736, 741 (W.D. Mich. 2010); *see* 29 C.F.R. § 785.17 ("An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call'"); *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 609 (6th Cir. 1992). In determining whether waiting time is for the benefit of the employer or the employee, a district court must consider all circumstances of the case. *See Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944). District courts in the Sixth Circuit have considered the following four non-controlling and non-exhaustive factors: (1) whether the agreements and understandings between the employer and employee indicate that waiting time will be compensated; (2) whether the employer requested or required that the employee wait; (3) the extent to which an employee's free

10

will is constrained during waiting time; and (4) the extent to which the employer actually benefits from the waiting time. *See Bernal*, 730 F. Supp. 2d at 741–45; *see also Williams v. Alimar Sec., Inc.*, No. 13-12732, 2016 WL 1046889 (E.D. Mich. Mar. 6, 2016); *Dekker v. Construction Specialties of Zeeland, Inc.*, No. 1:11–CV–252, 2012 WL 726741 (W.D. Mich. Mar. 6, 2012). The parties are in accord in applying the four-factor test announced in *Bernal* (Dkt. 21, Pg. ID 93–99; Dkt. 25, Pg. ID 265–68), so the Court will analyze whether Plaintiffs' time spent not actively engaged in towing was primarily for the benefit of Defendants or Plaintiffs under the four *Bernal* factors.[3]

### i. Agreements and Understandings

Defendants say it was their policy to permit Plaintiffs to spend time off site and to engage in personal activities during their work shifts. Dkt. 21, Pg. ID 95. Defendants support this claim with written declarations from three former and current tow truck drivers who had also previously worked with Plaintiffs for Defendants. These drivers testified that it was Defendants' practice and verbal

---

[3] Although the Sixth Circuit has neither endorsed nor rejected the *Bernal* four-factor test, this Court adopts it not only because the parties rely on it, but also because it provides useful analytical structure. By dividing the analysis into four non-exhaustive factors, the test systematically considers the most important circumstances of the case to determine whether Plaintiffs' waiting time was primarily to the benefit of Defendants or Plaintiffs and therefore compensable or non-compensable.

policy to permit tow truck drivers like the Plaintiffs to spend time at home and perform personal activities during their work shifts.

Plaintiffs argue in response that Defendants compensated Plaintiffs to remain ready to respond immediately to any towing requests. In support of this claim, Plaintiffs note: (1) the beliefs of Plaintiffs' coworkers, who did not work twelve-hours per day shifts seven days per week, that they were free to come and go as they pleased, are irrelevant; and (2) Plaintiffs' weekly compensation of $840 per week, calculated at $10.00 per hour, suggests an eighty-four-hour workweek during which Plaintiffs were expected to be ready to respond immediately to any towing requests from the Detroit Police Department received by dispatch. Dkt. 25, Pg. ID 265–66.

Viewing the evidence in the light most favorable to the Plaintiffs, this factor weighs in favor of Plaintiffs. A compensation structure of twelve hours per day paid at $10.00 per hour suggests that Defendants compensated Plaintiffs not only for time spent in towing operations but also for time spent waiting for towing calls. Further, this Court must scrutinize "the agreements between the particular parties." *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944). Defendants rely on declarations from Plaintiffs' coworkers regarding verbal policies, which Plaintiffs contend differed from their particular agreements and understandings with Defendants. Defendants have

12

not demonstrated the existence of any agreement or understanding between them and the Plaintiffs regarding compensation for waiting time. Consequently, genuine issues of fact exist with respect to this prong of the *Bernal* test.

### ii.   Whether Waiting Was Requested or Required

As to this prong, Defendants argue that (1) waiting time was not required and (2) "economic compulsion is not a controlling factor."[4] Dkt. 21, Pg. ID 94-5. Defendants emphasize that Plaintiffs were afforded the opportunity to leave Defendants' premises during their shifts. Dkt. 21, Pg. ID 95.

Plaintiffs respond that Defendants required Plaintiffs to be on the premises or responding to towing calls for the entire time of their work shifts. Dkt. 25, Pg. ID 266.

Defendants' reply brief does not thoroughly discuss this factor.[5] The reply could be construed as Defendants arguing that the Court should not find waiting time was required, because nothing in the record suggests Plaintiffs' requests for permission to leave the premises were ever denied. Dkt. 26, Pg. ID 274. Defendants also

---

[4] Economic compulsion is the "use of economic incentives, such as the increased likelihood of being hired, to encourage waiting." *Bernal*, 730 F. Supp. 2d at 742.

[5] Defendants cite *Aiken v. City of Memphis*, 190 F.3d 753, 761 (6th Cir. 1999) in discussing this factor. However, the cited *Aiken* discussion pertains to an employer's policy of requiring ill employees to remain at home unless permission is granted. Defendants do not explain how this might apply here, although perhaps Defendants intend the *Aiken* discussion to apply to the employee free will factor rather than this factor.

13

claim the Court is not required to accept Plaintiffs' testimony that they worked twelve-hour shifts seven days per week, because Plaintiffs have advanced no proof to substantiate their claim apart from their own self-serving assertions. *Id.*

Viewing the evidence in the light most favorable to the Plaintiffs, this factor favors the Plaintiffs. The evidence before the Court suggests that Plaintiffs waited around for towing calls due to "a requirement or request imposed by" Defendants and not because their "own desire to work [was driving their] decision." *Bernal*, 730 F. Supp. 2d at 742. Defendants concede that Plaintiffs' "[w]aiting time was requested." Dkt. 21, Pg. ID 94. Plaintiffs testified that they were required either to be on the Defendants' premises or responding to towing calls for the full time of their shifts. Plaintiffs' testimony is not directly rebutted by Defendants[6] and, in any event, must be credited for purposes of this summary judgment motion. It is clear that genuine issues of fact remain regarding this prong.

---

[6] The record shows that five current and former employees of Defendants with knowledge of Plaintiffs' work conditions signed declarations stating Plaintiffs were not required to, and did not, spend all twelve hours of their twelve-hour shifts at the Defendants' premises or at a location controlled by Defendants. Dkt. 21-8, Pg. ID 197; Dkt. 21-9, Pg. ID 202; Dkt. 21-10, Pg. ID 207; Dkt. 21-11, Pg. ID 212; Dkt. 21-12, Pg. ID 217. Defendants raise this issue in the "Employee's Free Will While Waiting" section in their motion for summary judgment to contest Plaintiffs' testimony. Dkt. 21, Pg. ID 97–8.

### iii.  Employee's Free Will While Waiting

Defendants next argue that Plaintiffs were free to do what they wanted during their shifts. Dkt. 21, Pg. ID 97–98. In support, Defendants note:

- Plaintiff Grubbs testified that he might only take two or three towing calls each shift, sometimes more and sometimes no tow calls at all. Otherwise, Grubbs watched TV in the front office, slept on a company-provided mattress, took lunch breaks, made phone calls, and surfed the Internet on his personal computer or phone.

- Plaintiff Leone testified that he occasionally visited his bank, his house, and his mother's house during shifts. Leone admitted that he could "go on a quick run" when he desired, as long as he notified the Defendants. Out of a twelve-hour shift, Leone admitted that he worked on average approximately three hours. Most of the remaining time included Leone watching TV, or doing miscellaneous activities such as shoveling snow, changing oil on cars, and staying "comfortable" at the office by sleeping.

- Five current and former employees of Defendants with knowledge of Plaintiffs' work conditions signed declarations stating Plaintiffs were not required to, and did not, spend all

twelve hours of their twelve-hour shifts at the Defendants' premises or at a location controlled by Defendants.

- Plaintiffs were allowed to, and indeed did, leave Defendants' premises between towing calls to go home and for personal purposes.

Additionally, Defendants discuss two cases to support their claim that Plaintiffs enjoyed significant personal liberty while waiting for towing calls. First, in *Rousseau*, the Fifth Circuit held that the plaintiff barge workers were not entitled to compensation for off-duty time. *See Rousseau v. Teledyne Movible Offshore, Inc.*, 805 F.2d 1245 (5th Cir. 1986). The court held the plaintiff workers were required to remain on the barge but "were free to sleep, eat, watch television, watch VCR movies, play ping-pong or cards, read, listen to music ... [and] seldom or never did any physical work after their shift ended." *Id.* Second, in *Halferty*, the Fifth Circuit held that the plaintiff ambulance dispatcher was not entitled to compensation under the "waiting to be engaged" doctrine. The plaintiff "could visit friends, entertain guests, sleep, watch television, do laundry, and babysit . . . [and thereby] use the time for her own purposes." *Halferty v. Pulse Drug Co.*, 864 F.2d 1185, 1189–90 (5th Cir. 1989).

Plaintiffs respond that their free will was constrained by Defendants' requirement that Plaintiffs remain at Defendants' premises. Dkt. 25, Pg. ID 266. In support of this contention, Plaintiffs offer

16

two arguments: (1) coworker declarations are irrelevant, because they do not address what Plaintiffs themselves experienced; and (2) even if credited, the coworker declarations merely create an issue of fact concerning Plaintiffs' testimony, which must be accepted as true for purposes of this summary judgment motion. *Id.*

Plaintiffs also distinguish *Rousseau* and *Halferty*. Dkt. 25, Pg. ID 267–68. First, Plaintiff argue that in *Rousseau*, the plaintiff barge workers were scheduled to be on the rig for seven days, then off for seven days. *Rousseau v. Teledyne Movible Offshore, Inc.*, 805 F.2d 1245, 1247 (5th Cir. 1986). While on the rigs, they were on duty for a designated shift of set hours per day, and were only paid for those hours. *Id.* During the remaining hours, the plaintiffs were not required to perform any work, but could not leave the rig. *Id.* The employees had the opportunity during their off-duty hours to perform additional work when available, thereby earning additional wages, including overtime. *Rousseau v. Teledyne Movible Offshore, Inc.*, 619 F. Supp. 1513, 1516 (W.D. La. 1985), *aff'd in part*, 805 F.2d 1245 (5th Cir. 1986). After their scheduled shifts, the employees were "completely released from all job duties." *Id.* at 1515. The off-schedule time of the plaintiffs in *Rousseau*, therefore, fit exactly with the regulatory definition of being "off duty." 29 C.F.R. 785.16(a) (An employee "is not completely relieved from duty and cannot use the time effectively for his own purposes unless he is

17

definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived."). *Rousseau* provides an instructive contrast to the present case, Plaintiffs argue, because unlike the plaintiffs in *Rousseau*, Plaintiffs were not released from all job duties during waiting times and were required to perform job tasks as needed during waiting times, as opposed to having an opportunity to do so for additional wages. Dkt. 25, Pg. ID 267. This distinction is well-taken.

Second, in *Halferty*, the plaintiff enjoyed substantially more liberty than Plaintiffs did. Dkt. 25, Pg. ID 266–67. The plaintiff in *Halferty* worked at home as a night dispatcher, receiving calls for transport and relaying them to her employer's drivers. *Halferty v. Pulse Drug Co.*, 864 F.2d 1185, 1187 (5th Cir. 1989). "Halferty's work required her to answer a small number of telephone calls each night, but otherwise allowed her to pursue personal, social, and business activities. For example, she could and did eat, sleep, watch television, entertain guests, babysit, and do laundry. Halferty also could leave her home so long as she could have her calls forwarded or could find someone else to answer them." *Id.* The plaintiff in *Halferty* was thus virtually unrestrained in her ability to engage in whatever personal activities she wished during her scheduled time. Dkt. 25, Pg. ID 267. In contrast, Plaintiffs testified in this case that they were not permitted to leave Defendants' premises except for

short runs to a store or home to pick up something, essentially equivalent to break times. *Id.* They had no opportunity to entertain guests, go to restaurants, or visit family or friends. *Id.* They were not working at home during their scheduled hours. *Id.*

In their reply brief, Defendants emphasize that for waiting time to be compensable, restrictions on the employee's free will must be severe. Just because an employee's personal activities may be affected does not mean that the time spent on-call is automatically compensable. *Martin*, 968 F.2d at 611. Instead, Plaintiffs "must establish . . . severe restrictions." *Id.* The facts in this case do not suggest any "severe restrictions," Defendants argue.[7]

Defendants rebut Plaintiff's attempt to distinguish *Rousseau*. Like the plaintiffs in *Rousseau*, Defendants contend that Plaintiffs were free to sleep, eat, watch television, surf the Internet, and, at least by the admission of one Plaintiff, make a stop at home, visit a parent, or make a run to the bank. Dkt. 26, Pg. ID 276.

Defendants' argument is not well-taken, and the Court finds that this factor favors Plaintiffs, when construing the facts in a light most favorable to them. An employee retains free will while waiting if "permitted to use that time any way he or she wants" without the

---

[7] The *Martin* court's primary example of a "severe restriction" that is "so onerous as to prevent [employees] from effectively using their free time for personal pursuits" is having to "arrive [at the employer's premises] within a certain time after being called." *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 611–12 (6th Cir. 1992).

employer exerting control over the employee. *Bernal*, 730 F. Supp. 2d at 743. The requirement that an employee return within a short period of time is an indicator of an employer exerting control over the employee. *Renfro v. City of Emporia, Kan.*, 948 F.2d 1529, 1534 (10th Cir. 1991) (holding plaintiff firefighters who were on call for twenty-four-hour periods, during which they were required to carry pagers and return to work within twenty minutes when called and were called back an average of three to five times per twenty-four-hour period, could not use the time effectively for personal pursuits). "[T]he employees may be able to show, like the employees in *Renfro*, that the employer calls them back so frequently as to make effective use of the [waiting] time impractical. . . . [This interference is] representative of the type of showing that an employee must make to survive a motion for summary judgment." *Martin*, 968 F.2d at 612. For purposes of this motion, Plaintiffs' testimony, even if contradicted by Defendants' other employees, must be accepted. Defendants' alleged requirements that Plaintiffs remain on the premises except for breaks to stop at home, visit a parent, or visit the bank and stand ready to respond to towing calls within a twenty-minute period demonstrate exertion of control over the Plaintiffs that seriously limited their personal liberty. With respect to this prong of the *Bernal* test, Plaintiffs have satisfied their burden of

20

identifying a genuine issue of material fact for resolution by the fact-finder.

### iv. Actual Benefit to the Employer

Defendants argue they received little to no benefit from the time Plaintiffs spent waiting for towing calls. Dkt. 21, Pg. ID 98. Defendants claim: (1) Plaintiffs could be called to tow a vehicle and thus had no need or reason to be constantly present at the office; and (2) because Defendants through their dispatchers would contact drivers depending on their respective locations, if a tow truck driver was closer than others, he would be the first to be ordered to respond to the towing request so Defendants could meet their twenty-minute response deadline. Dkt. 21, Pg. ID 98. At the same time, Defendants recognize "the fact that Defendants were able to use Plaintiffs' wait time to ensure employees were prepared to work." Dkt. 21, Pg. ID 99.

Plaintiffs respond that their presence on the premises (while not making towing runs) benefited Defendants. Defendants were required to have a tow truck respond within twenty minutes after a call was made to dispatch. Plaintiffs thus argue that requiring drivers to remain on the premises helped ensure that the twenty-minute deadline could be met. Dkt. 25, Pg. ID 268.

In reply, Defendants acknowledge "the fact that Defendants benefited from the Plaintiffs being required to remain on the premises"

during waiting periods. Dkt. 26, Pg. ID 275. Defendants deemphasize the importance of this factor, citing three cases: *Allen v. Atl. Richfield Co.*, 724 F.2d 1131, 1136 (5th Cir. 1984) ("There are many instances . . . in which time spent on the employer's premises is not compensable working time."); *Howard v. S. Cont'l Tel. Co.*, 72 F. Supp. 276 (M.D. Tenn. 1944) (finding night switchboard operators who were permitted to sleep on the premises when their presence was not required at the switchboards were not entitled to compensation for the entire duration of their shifts); and *Thompson v. Loring Oil Co.*, 50 F. Supp. 213 (W.D. La. 1943) (holding oil well pumpers who were on duty for twelve-hour shifts but worked only part of the time they were actually available for duty need not be compensated for time they were available but not active).

Viewing the evidence in the light most favorable to the Plaintiffs, this factor also weighs in favor of Plaintiffs. First, Defendants concede that Plaintiffs' wait time ensured employees were prepared to work and that Plaintiffs' being required to remain on the premises between towing calls benefited Defendants. Furthermore, whether Defendants' "ability to guarantee the prompt and continuous delivery of labor to its customers is . . . dependent on the physical presence of employees in the office" (*Bernal*, 730 F. Supp. 2d at 743) is a factual question for the fact-finder to determine. Defendants assert that diversity in drivers' geographical location allows for fast

22

response times to towing calls.[8] Plaintiffs claim having drivers on Defendants' premises allows drivers to meet Defendants' twenty-minute response deadline. Because factual inferences must be drawn in the nonmoving party's favor, the Court must accept Plaintiff's proffered reasoning. Accordingly, the trier of fact should be allowed to evaluate this factor.

### v. Totality of Circumstances

In sum, the Court finds that each *Bernal* factor favors the Plaintiffs, when evidence in the record is viewed in the light most favorable to them. Therefore, Defendants' motion for summary judgment on Plaintiffs' FLSA overtime pay claim is **DENIED**.

### b. Abuse of Process/Extortion Counterclaim

Defendants also move for summary judgment on the counterclaim that they have asserted against Plaintiff Grubbs. The counterclaim at issue (Dkt. 5) states a single cause of action – "extortion" under Mich. Comp. Laws § 750.213. However, Defendants' motion for summary judgment requests summary judgment on an "abuse of process" counterclaim that was never pleaded. Dkt. 21.

---

[8] This argument is less persuasive, because Plaintiffs were not required to inform dispatchers of their whereabouts. Dkt. 21-8, Pg. ID 198; Dkt. 21-9, Pg. ID 203.

Defendants[9] and Plaintiff Grubbs disagree about whether the Defendants have properly asserted an abuse of process counterclaim against Plaintiff Grubbs. As noted above, the counterclaim alleges extortion, not abuse of process. The claim relates to certain text messages Plaintiff Grubbs sent to Defendant Hilkert on February 17 and March 2, 2016. As a preliminary matter, the Court will address the procedural question of whether Defendants' extortion counterclaim may be construed as a cause of action for abuse of process. The Court answers this question in the negative, and finds Defendants are procedurally barred from seeking summary judgment on an abuse of process cause of action.

### i.  Procedural Posture

Defendants argue that their claim should be construed by the Court as "abuse of process in the form of extortion." Dkt. 21, PG. ID 99.

Plaintiff Grubbs responds that because Defendants seek summary judgment on an abuse of process counterclaim rather than the pleaded counterclaim of extortion, the motion for summary judgment on the counterclaim should be denied. Dkt. 25, Pg. ID 268–69. Defendants address only the elements of an abuse of process claim, not an extortion claim.

---

[9] Plaintiff seems to mistakenly assume that H&B and Elite are not asserting the counterclaim. *See, e.g.*, Dkt. 25, Pg. ID 251; Dkt. 25, Pg. ID 270. But it is clear that all four Defendants join in the counterclaim. Dkt. 5, Pg. ID 30, 32.

Defendants make three main arguments in support of their position that the Court should construe the counterclaim as one for abuse of process:

- The Michigan Supreme Court has recognized the tort of abuse of process to encompass extortion.[10] Dkt. 26, Pg. ID 276–77. *See Marlatte v. Weickgenant*, 147 Mich. 266, 275 (1907) ("The wrong committed by extorting money from its owner by means of an abuse of criminal process is not different in character from extorting by the same means his horse or his ox or his ass or any other thing that is his. In either case an action on the case is permissible.")

- Defendants did not need to plead a separate count of abuse of process, because an abuse of process claim encompasses conduct akin to extortion. In *Lepard v. NBD Bank, A Div. of Bank One*, 384 F.3d 232 (6th Cir. 2004), the Sixth Circuit held that a magistrate judge's decision to construe a cause of action for extortion filed *pro se* to assert a cause of action for conversion based on the factual pleading was not clearly erroneous. *Id.*

---

[10] Defendants also cite the following passage from the court's opinion to support their contention, although the passage is merely quoting the plaintiff's attorney: "This is strictly an action on the case—upon the facts pleaded and proven—to recover damages for injuries sustained by the plaintiff on account of the abuse, and misuse, of the criminal process of the state, for the purpose of extorting money by intimidation, fear, and duress; in other words, the wrongful and malicious use and abuse of the criminal process of the state, for the purpose of collecting a debt, and unlawful sums as costs." *Marlatte v. Weickgenant*, 147 Mich. 266, 273 (1907).

at 236–37. Analogizing to *Lepard*, construing the extortion cause of action as an abuse of process cause of action is appropriate.

- Defendants' counterclaim has pleaded a "plausible" claim to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The factual allegations in the counterclaim meet this standard. Dkt. 26, Pg. ID 278.

- Plaintiffs, as the non-moving parties, have failed to meet their burden of presenting specific facts showing there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

The Court finds Defendants' arguments unavailing; their motion for summary judgment on an abuse of process cause of action is procedurally barred. In *Trustees of the Detroit Carpenters Fringe Benefit Funds v. Rush Construction Services, Inc.*, No. 12-15357, 2014 WL 12567180 (E.D. Mich. Nov. 14, 2014), the court rejected defendants' argument that *Marlatte* supported an abuse of process claim when defendants alleged an extortion claim. There, the court noted that "[defendants] have not allege[d] that the [plaintiffs] have abused the criminal process in filing this case", and dismissed defendants' abuse of process claim. *Id*.

26

Second, *Lepard* is distinguishable. The plaintiff in *Lepard* filed her complaint *pro se*. She pled "extortion and theft," which the magistrate judge construed as a cause of action for *conversion*. The case did not involve construing a claim of extortion as an abuse of process claim. Moreover, *pro se* pleadings are held "to less stringent standard than formal pleadings drafted by lawyers." *Luis v.* Zang, 833 F.3d 619, 626 (6th Cir. 2016) (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)). Here, all parties are represented by counsel. The counterclaim in this case lists one count: "COUNT I – EXTORTION." Dkt. 5, Pg. ID 32. Additionally, the Sixth Circuit reviewed the magistrate judge's findings under a "clearly erroneous" standard. *Lepard*, 384 F.3d at 237. *Lepard* is thus inapposite.

Third, *Twombly* is inapplicable*,* as it concerned a complaint with limited factual allegations that did not show sufficiently that the pleader was entitled to relief under Fed. R. Civ. P. 8(a)(2). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007). Here, Defendants' claim is not challenged under Fed. R. Civ. P. 8(a)(2). *Twombly* does not inform the Court's decision on whether the Defendants can now assert a cause of action for abuse of process when they pleaded a cause of action for extortion.

Because Defendants' motion for summary judgment addresses the abuse of process counterclaim rather than the pleaded extortion

counterclaim, the motion for summary judgment on the extortion counterclaim is **DENIED**.

### ii. Abuse of Process Claim

Even if the Court did find that Defendants asserted a valid abuse of process claim, they still would not be entitled to summary judgment. Defendants argue that Grubbs's text messages to Hilkert within the context of this legal proceeding constituted an abuse of process. "To recover pursuant to a theory of abuse of process, a plaintiff must plead and prove (1) an ulterior purpose, and (2) an act in the use of process that is improper in the regular prosecution of the proceeding." *Bonner v. Chi. Title Ins. Co.*, 194 Mich. App. 462, 472 (1992).

Defendants argue that Grubbs's threatening to report Defendants to initiate criminal proceedings was an abuse of process. Dkt. 21, Pg. ID 100. Grubbs's March 2, 2016, text message threatened to report Defendants to the IRS and insurance and arson investigators if Defendants did not agree to settle this lawsuit.

Defendants rely on *Three Lakes Ass'n v. Whiting*, 75 Mich. App. 564, 573 (1977). In *Three Lakes*, the defendant had offered to dismiss an action for damages without the need to pay compensation if the plaintiff ceased opposition to the development of a condominium project. *Id.* The court held that the ulterior purpose of stifling

28

opposition was collateral to the defendant's maintenance of a lawsuit. *Id.* Improper use of process usually takes the form of coercion to obtain a collateral advantage in a manner not part of the legal process itself. *Id.* This includes, for example, the use of legal process as a threat to force the payment of money that is not rightfully recoverable through that legal process. *Id.* There is, however, no "ulterior" purpose here. Plaintiff Grubbs's text message sought to recover the overtime pay that he believed he was entitled to. This lawsuit seeks to obtain the same relief. Grubbs's text messages, while perhaps unsavory and unprofessional, do not give rise to an abuse of process claim.

Defendants also discuss at length *Estate of Roush ex rel. Hardy*, No. 317406, 2014 WL 7004021, at *1 (Mich. Ct. App. Dec. 11, 2011). In *Roush*, the plaintiff filed suit alleging that "defendant unlawfully detained Roush at [a care] facility while a determination was pending with regard to Roush's ability to make treatment decisions for herself and that defendant's agents committed various torts while Roush was at the facility and after Roush was discharged from the facility." *Roush*, 2014 WL 7004021, at *1. "[P]laintiff's claims of abuse of process ar[o]se out of the allegations that one of defendant's employees improperly helped . . . file a petition for guardianship . . . after [plaintiff] was discharged from the facility, and that these actions were done for the improper purposes of harassing

Roush, retaliation against Roush, and financial gain if Roush remained in the facility." *Id.* The guardianship petition, an alleged abuse of process, arose in the context of already-existing "proceedings," where the defendant had first become "a patient advocate" under Michigan Court Rules. *Id.* Defendants argue that Grubbs cannot raise a dispute of material fact, as "he explicitly acknowledged sending text messages in order to exploit current legal proceedings by coercing Defendants into paying money to settle this pending lawsuit." Dkt. 21, Pg. ID 102. A cause of action for abuse of process requires "an act in the use of process." *Bonner v. Chicago Title Ins. Co.*, 194 Mich. App. 462, 472 (1992). There is nothing on the record indicating Plaintiff Grubbs ever followed through on the threats contained in his March 2, 2016, text message to Defendant Hilkert or otherwise improperly initiated a legal proceeding. Sending a text message alone is not "an act in the abuse of process." *Id.* Defendants thus are not entitled to summary judgment in their favor on such a claim.

### iii.  Extortion Counterclaim

Michigan law recognizes a civil tort based on a violation of the criminal offense for extortion under Mich. Comp. Laws §750.213. *See Carson Real Estate Cos. v. CoStar Grp. Inc.*, No. 10-CV-13966, 2011 WL 4360021, at *6 (E.D. Mich. June 30, 2011), report and recommendation adopted sub nom, *Carson Real Estate Cos. v. Constar*

*Grp., Inc.*, No. 10-CV-13966, 2011 WL 4360017 (E.D. Mich. Sept. 19, 2011) (citing *Jersevic v. Kuhl*, No. 238808, 2003 WL 1558207, at *1 (Mich. Ct. App. Mar. 25, 2003)). One commits extortion under Michigan law if he: (1) maliciously threatens by written communication (2) to accuse another of a crime or offense (3) with the intent thereby to extort money or pecuniary advantage. Mich. Comp. Laws §750.213.

The thrust of Defendants' counterclaim is that Plaintiff Grubbs threatened by text message to report Defendants' allegedly unlawful activities to the IRS and arson and insurance investigators if Defendants did not promptly agree to settle this lawsuit. In view of the elements of this cause of action, Defendants may have a viable extortion claim against Grubbs (although damages may be nominal given that Defendants did not settle this lawsuit or otherwise give money to Grubbs). *See Norman Yatooma & Assocs. PC v. 1900 Assocs. LLC*, Nos. 313487, 316754, 2014 WL 2619445, at *10 (Mich. Ct. App. June 12, 2014).

However, Defendants offer no arguments in support of granting summary judgment in their favor on the extortion claim that they actually pleaded.  Defendants focus their briefing instead on an abuse of process claim that they never pleaded. Consequently, summary judgment on this claim is inappropriate, and this claim must proceed to trial.

31

V.     **Conclusion**

For the foregoing reasons, Defendants' motion seeking summary judgment against Plaintiffs' overtime pay claim, and in favor of Defendants' counterclaim against Plaintiff Grubbs is **DENIED**.

**SO ORDERED.**

Dated:  August 2, 2017      s/Terrence G. Berg
                            TERRENCE G. BERG
                            UNITED STATES DISTRICT JUDGE

**Certificate of Service**

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on August 2, 2017.

                            s/A. Chubb
                            Case Manager

32